24-3224 and 24-3281, Western Arkansas, Fort Worth Partners v. Nilfisk, et al. Good morning and may it please the Court, Lisa Geary on behalf of Nilfisk. This case involves the insurance obligation in a commercial lease agreement. That lease contained several bargained-for provisions to protect the owner, Fort Worth Properties, against noncompliance. It did not employ a single one of them. Instead, it sat on its rights for six years and waited until a tornado destroyed the building to seek to recover $30 million. The District Court should have granted summary judgment to Nilfisk on two independent grounds. First, Fort Worth Partners' claim is time-barred. The breach occurred in 2016 when Nilfisk failed to obtain adequate insurance, not in 2022 when the tornado struck. Second, the undisputed facts in the summary judgment record establish as a matter of law that Fort Worth Partners' claim for relief was barred by the Doctrine of Avoidable Consequences. The Court should reverse and remand for Nilfisk on either ground. Alternatively, it should vacate and remand on an issue that the parties appear to agree was a clearly erroneous portion of the damages award after trial. I'd like to begin with the issues in Nilfisk's appeal, and if time permits, I can begin to address some of the issues in the Cross appeal as well. On the statute of limitations issue, Arkansas law is clear that the claim began to accrue when the plaintiff could have first maintained the action to conclusion. On this obligation for insurance, wasn't there an obligation to reassess the value each year? In other words, the insurance amount that would be paid or the policy amount would be different every year? Is that accurate? I don't think it is, Your Honor. The obligation under 10.2 was to purchase and maintain a tenant's policy or plural policies for the all-risk commercial property insurance. The argument here is that there was not enough, so they had insurance. There was insurance, but there was not enough. Correct. So wouldn't that alone make this a different type of claim each year? I don't think so, Your Honor, for a couple of reasons. First, the fact that Nilfisk renewed insurance at different periods of time… Well, it didn't really renew, did it? Because these are separate policies with new policy numbers. They changed companies at one point in the middle of it. These are new policies. I think you'd have a totally different argument if you had a policy that was purchased and it just renewed annually and it maintained the same policy number and the premium just moved as the assessed value of the property changed. Then I think your argument is indisputably sound. But if you look at this policy, there's a new policy issued every year. The policy is then tendered. And isn't that the point of tendering? Isn't that just a new claim every single time? And why not? Your Honor, I don't think so. And I think the answer is because the exception that Arkansas law recognizes for when these discrete acts of breach can or the discrete acts can give rise to separate claims of breach, that occurs. Arkansas law has only recognized that in the context of installment contracts, where the contract itself actually required distinct payments to be made at particular intervals or periods of time. And here, we didn't have that. The contract contemplated a scenario where NILFIS could have obtained a policy that covered the entire lease term, recognizing, Your Honor's question, that, in fact, they did obtain separate policies. But that wasn't required under the contract. I think that's what distinguishes those installment contract cases from this being an act of perhaps you would call it a continuing breach. And Arkansas, unlike other states that have recognized continuing breach theories, Arkansas courts have not. The Beckworth case the parties rely on in district court discussed expressly says that Arkansas courts don't recognize a continuing breach theory. Even the district court below the Western District in another case has recognized, true to this day, Arkansas courts do not recognize a continuing breach theory. So Pennington certainly contemplates a scenario where, you know, if the contract had required policies to be obtained each year or various years, then perhaps each violation of those, you know, requirements would have been separate claims of breach. But because the policy here doesn't mandate that, we think that the breach instead is more like a continuing breach theory. And that means that the statute of limitations began to accrue at the moment they first could have brought a claim for breach back in 2016. So if at some point since, is it 2016, you say, is the first breach? Correct. So some, you know, 2018, they actually, you actually did have enough insurance, and then you didn't in the next, then it would be 2018 would be the mark, or 2019. Correct. The analysis would be different, I think, if we had, you know, perhaps breached or arguably breached the contract in 2016. Then in a different year, we cured that, we obtained adequate insurance, and then subsequently breached again. A claim for breach would have begun to accrue from, I think, you know, the moment that they have a new distinct act of breach under the contract. And here, I think the factual difference is that there was never a situation in which we complied with this obligation. So that's why the claim began to accrue back in 2016. And going to the district court's reasoning here, I need to note, the district court construed the statute of limitations, or found that the statute of limitations began to accrue at the moment the tornado hit. I don't think either party really advances that understanding of the statute of limitations, because certainly these insurance obligations exist to secure against a risk of loss. Policy triggering loss may not ever occur. Right, because there's two things going on here. There's the loss claim, which accrues at the time that you've incurred the damage, and there is the failure to comply with the contractual obligation to obtain the policy, and that accrues when the inappropriate policies are not obtained. That's correct. Or when the appropriate policies are not obtained. So I would move then, you know, if the court didn't agree that the statute of limitations, the five-year statute of limitations in Arkansas bars this claim, there is an independent ground to reverse here, and that's on the doctrine of avoidable consequences. And this is a common law doctrine in Arkansas. It's on the older side. A lot of the cases that have applied this are older, from the 1920s, but it's still a sound common law doctrine in Arkansas. Is it a doctrine of damages? In other words, not of liability. It seems to me that my basic understanding is that it's a doctrine of damages, so that it would mean you couldn't collect the full amount of damages because of the avoidable consequences. Not necessarily the liability, or am I wrong about that? That's correct. It does not absolve a claim of breach. But the reason why in this case we think it does require summary judgment for NILFSC is that the doctrine exists where a party reasonably could have avoided the damages that they're claiming. Reasonably and without, what is it, incurring only a trifling duty, right? Correct. Now that seems to me, and no expense, at little expense and at trifling duty to the party, right? Yes. Because it's asserting that they had no duty to mitigate at that point, right? And so your claim is that if they had gone out and bought a policy for $2 million, your company, NILFSC, would have just been gladly willing to just pay that, and therefore it was just a trifling duty and at no real expense to them. But more than that, the contract actually required that. The contract put an obligation on NILFSC that if Fort Worth Partners at any point thought that we were underinsured, if it had gone out, one, it could have demanded that we go out and purchase additional insurance. That would have been at no expense. But if it had gone out, as Your Honor suggested, and bought insurance, it was then able under the contract to put that entire cost on us. So in this, recognizing the doctrine typically comes up in factual circumstances. You know, the district court is correct that generally speaking, whether someone acted reasonably or not could be a question of fact. Whether something could have been done for a trifling expense could be a question of fact. But on this record, the undisputed facts show that Fort Worth Partners could have avoided all of the damage from underinsurance at no cost. So your – the evidence that you rely on for your theory there is just simply the contract? No, Your Honor. In the summary judgment record, in the party's statement of undisputed facts, which the district court adopted and repeated many of them in its statement of undisputed facts, that summary judgment record shows that Fort Worth Partners admitted that it received and looked at certificates of property insurance from NILFSC each year from 2016 to 2022. That's in Appendix 946. It admitted that purchasing additional insurance would have come at no expense. It admitted that fact, Appendix 948. It admitted that NILFSC never obtained more than $10 million in insurance in any given year during the lease. That's the Appendix 950. And it admitted that appraisals at various points in the lease valued the building at over the amount NILFSC had insured. That's Appendix 951. And as I said, the district court Addendum 4 recited all of these undisputed facts. And we think that record on summary judgment is, one, what makes this a purely legal issue that the court can review on appeal, and, two, means that we were entitled to judgment as a matter of law on that issue. I would like to reserve the remainder of my time for rebuttal, if I may. Let me just ask. You don't need all that time. It strikes me what's particularly unfair, if you will, about this, is if Forward Partners would have asserted this failure to comply at the first time that it spotted it. Everything would have been avoided, because working out that claim, the parties would almost certainly have come to an agreement on a procedure to follow. What do you have to look at? How do you determine whose determination is reliable? And then, did you do it right? So we would not have had any of this stuff. That's exactly right, Your Honor, and better said than I could put it. There would have been a lot more insurance paid for in the tornado year, maybe. Maybe not. But how does my equitable concern, if you will, how do you think it translates into Arkansas law? Well, I think that is exactly why this common law doctrine exists. How do you apply that problem? You don't argue avoidable consequences as saying, well, if you had done that, then the parties wouldn't have made that mistake again. Your Honor, I think so. Or let me put it a different way. Are any of your avoidable consequences cases, do they talk about this kind of problem? I think so. And if so, which ones? Your Honor, the Kirtner v. Bank of Jonesboro case that we cited, Kirtner v. Bank of Jonesboro from 1927, I think, there was an example, just to address it briefly, where the plaintiff and the bank had entered a contract. They had an agreement. The obligation was on the bank to provide an abstract title to the property and clearly put that obligation on the bank. The plaintiff tried to get it from them. The bank didn't provide it. The bank breached its obligation. But the court said, yes, but you're now seeking a windfall of damages because as a result of that, he lost out on the sale of the property. The plaintiff came back and asked for that. But this isn't a windfall. This would have been prevented by NILFIX doing its job better. They took it to a marching to a drummer that had been worked out the first time the problem was brought to their attention. You know, I hate to take more of your time, but as I studied this case, I kept coming back to this idea that, you know, Arkansas I think does recognize the common law doctrine of equitable estoppel by conduct. And under that doctrine, and avoidable consequences is a mitigation concept, never fit very well for me. And I kept thinking you're really arguing this equitable estoppel by conduct. And that is you presented a policy that was on its face inadequate, that they had a duty to, and so the other side had knowledge of that fact, policy is inadequate. They had a duty to investigate, decide whether to accept it or not. By failing to act, they left you in a position where you didn't act, right? And, you know, and I think that fits arguably into the element that talks about lack of knowledge on the part of the defendant, but maybe not. But, I mean, it seems to me that that may fit. And that then you detrimentally rely on their failure to object, right? Now, that seemed to me like how that case really frames up and what everybody is really arguing here is that they had some duty to act when presented with this policy, these policies that were inadequate to provide sufficient coverage. But instead we're talking this avoidable consequences doctrine, which this keeps looking to me like square peg round hole kind of a thing. In that, you know, you're talking about mitigating damages when really what your underlying claim is we have no liability beyond the presentation of the policy we've already presented. Well, Your Honor, I see my time is up. If you'd permit, I can answer the question. I think, Your Honor, the reason that avoidable consequences fits here is that there is another world or different factual scenario you can imagine in which if, you know, Fort Worth partners had alerted us to the lack of underinsurance, or if the question of underinsurance was closer. Here they're claiming on appeal we were underinsured by 500%. But if the question was closer and, you know, maybe we would have an argument that the damages delta that comes up in avoidable consequences is closer. Those all, of course, would have been factual issues in a different scenario. I think that's why the doctrine fits here. The problem, as you've noticed, on these facts, our position is that they, you know, didn't take any of the steps that a reasonable property owner would have taken at no expense in this case. And that's, it may seem an odd fit, but the answer here under avoidable consequences is that that means they could have avoided all of the damages. Thank you for permitting me to answer the question. Mr. Kastin. May it please the Court. My name is Martin Kastin. I represent the Appley and Cross Appellant Fort Worth Partners. On appeal, NILFSC admits that it breached the lease. And the only questions are, are its defenses excuse it? They don't. And whether the damages awarded fully enforce the party's bargain. And it doesn't. I can't keep up with who's plaintiff and who's defendant, depending on who's talking. Yes, Your Honor. Your briefs, frankly, just confuse the heck out of me on that by seeming to call my client the plaintiff in one sentence and the defendant in the next. Who are you talking about? We represent the plaintiff, Fort Worth Partners, Your Honor. And, you know, going into the statute of limitations question that Judge Kelly had raised, the answer of why there are separate breaches in here is kind of what Your Honor hit on, which is the text of the lease created future recurring obligations to maintain 100% of the then full replacement cost throughout the term. And this duty to maintain insurance involves the recurring duty such that in 2016, it could not have been known what insurance was in place and whether it was maintained in 2022 or other years. And each of those were separate breaches, as Your Honor had mentioned. And we think that Pennington controls this issue. In Pennington, it decided under this very statute of limitations under Arkansas law, 1656.111, that breaches that occur outside of the statute of limitations do not bar actions for breaches that occur within the statute of limitations. And here, that is what we think applies. The breach that occurred here occurred in 2021 when an insufficient policy was in place for then ultimately the tornado. And we think since this court's obligation, as I understand it, is to predict Arkansas Supreme Court that Pennington answers that question. As to the doctrine of avoidable consequences that's at issue, we do not believe that the issue is preserved. We believe that NILFSC is seeking review of an unappealable or unreviewable order because there was a denial of summary judgment in attempts to appeal after a full trial on the merits. But the district court left it open for trial, right? It did, Your Honor. And it said that NILFSC had not met its burden of proving an absence of material fact issue. And it also said, after discussing some of the proof, it said, quote, without more. Did you cross-appeal a district court allowing it to be heard after judgment? I didn't follow your question, Your Honor. Could you repeat it, please? You didn't cross-appeal. Judge Kelly said the trial court left it open after trial. And so now you're saying it was not preserved because it was covered in a pretrial summary judgment motion. As I understand, they left the fact questions for trial, and no evidence was ever submitted on the fact questions, and therefore the case was never developed. And when it came to rendering the judgment, Judge Brooks didn't make specific findings on that particular issue because no evidence was ever presented. So the prior denial just stood on that issue. Isn't that true? That is exactly correct, Your Honor. There was no proof. And on a summary judgment, the law question is preserved. If it was a pure legal question, as the Supreme Court has stated, for example, in the Dupree case. Well, they're arguing it as a legal question. Come on. So what would be before us is whether the judge was wrong when the judge concluded that there was a fact issue. That's the legal question. We'd review that de novo. And if we agree that Judge Brooks was right, that there was a material legal or material fact question that needed to be resolved, and then that fact question is never resolved, then the plaintiff's claim fails on that issue as a matter of law, right? You're right, Your Honor. It would fail as a matter of law without any proof. The issue also, the Supreme Court in Ortiz had mentioned that if it's decided on whether or not there's a fact issue, that the issue is not a, quote, purely legal issue because essentially purely legal issues are trying to hash out the law. Here, there wasn't a question about the law of the doctrine of avoidable consequences. Here, we're talking about the application of facts to that doctrine. And there were multiple fact questions that were involved there. You know, at Appendix 929 and 930, Nilfisk made admissions that it was reasonable for Fort Worth Partners to believe that Nilfisk would perform its obligations under the lease. In addition, there was no proof about how much insurance would cost or that Fort Worth Partners would have sufficient money to front that amount. And so the idea or the argument that there's, you know, no risk or that, you know, Fort Worth Partners could automatically get it back, well, the question is whether it even had the money on the front end to go purchase that insurance. Can we consider Judge Erickson's equitable estoppel theory? I do not think that the equitable estoppel was either pled or developed below. And so I do not think that it applies, frankly, in this matter. Can we consider it as different than whether it applies? Oh, I'm afraid I would have to go back and look at what the equitable estoppel theory is. Well, we've said we can pick up arguments that weren't raised, but we consider controlling. And, Your Honor, I think that might be true if, you know, you were looking to affirm on an alternative ground. But this would be a new ground that the appellant did not raise on appeal. And so we don't think that that would be permissible. Your Honor, moving to the cross-appeal issues, we have a contract construction issue, and here the district court erred when it construed the lease's full replacement cost obligation to exclude the replacement costs of the above-ground foundation. It is undisputed that a considerable part of the building's foundation was elevated four feet above ground, including its 200,000-square-foot slab. The district court, however, excluded the entire foundation from damages. And we believe that's error because the lease's text defines full replacement cost, and it excludes only the cost of footings, foundations, and other structures below grade. And here the district court's construction of it does not give meaning to the word other in that. Well, it may be if you said other below-grade structures, but it's other structures below grade. So to me those are two different phrases, at least in the context of your series of three. You're right, Your Honor. In the series of three, and as Your Honor knows, Arkansas prohibits surplusage if a reasonable meaning can be given to each word. And here we believe that's true. Other in that phraseology is not separated by determiners. It's not separated by punctuation such as semicolons. And so we believe that that goes throughout that whole – it modifies the term as a whole. What about the district court's findings that just the expense of determining what was above and what was below and the practical approach of that no one really thinks of the foundation as split in the way that you're asking it to determine? Your Honor, I think the difference was I think the district court had used kind of a tree example with roots and things. But here what we're really talking about is just the cost of insurance, the cost of getting whatever it is that should have been insured. And so the grade level kind of is a natural place of dividing about what needs to be insured and what doesn't need to be insured. But as you look at the evidence in the record, does it adequately divide the cost between below grade and above grade? I mean, is there an actual factual basis? It seemed to me that, and you're looking at what Judge Brooks is saying, is first of all it seems like just a tassel in the sky. It seems like an odd analysis to do in the first instance. But in the second instance, dividing it up and figuring it out was impossible on the record. And he didn't say it quite that plainly, but it is where I saw him going on it. And the question is, was it in fact impossible on the record to divide those costs? Your Honor, it was not impossible. And, in fact, there were line items in Fort Worth Partners' expert report. It's lines, I believe, 30 through 34 on his expert report that essentially says, here is the cost of a four-foot above ground slab, and it gives the amount. That would be entirely above ground. He separately breaks out what the footings would be. So if the district court did not want to or thought that the footings should have been excluded, it had the ability to do that. And, Your Honor, as far as how or the measure of damages that the district court applied, we believe that it erred there as well. This is what we refer to in our brief as the replacement remedy versus the repair remedy issue. And, essentially, the district court ordered a repair remedy instead of a replacement remedy. But the bargain between the parties was for replacement cost insurance, not repair cost insurance. And the court cannot substitute a repair remedy for a replacement promise. Contracting parties under Arkansas law, when they fashion their own remedies, the Supreme Court of Arkansas has found that the remedy provided is conclusive. That's the Edwards versus Perdue case. And once the district court found that the foundation had sustained damage, its obligation, according to the lease, was to award replacement damages, not repair damages and not damages that would make the building or the foundation code compliant. Code compliant is nowhere mentioned in the lease. But that is where Nilfisk really kind of stands its ground on. So once the court found that the foundation had been damaged, and it did, it found that there were longitudinal cracks through the slab, there was spalling of concrete, there was the necessity of removing and replacing pedestals that came through the slab that held the interior columns of the building. Once it found that, what it did is that it awarded $500,000 to repair the slab, plus another $750,000 for a repaired topping slab. But the lease required a replacement remedy, not a repair remedy. That's what replacement cost insurance was for. Now, on appeal, the other side raises this section 18.1. Interestingly, that section below Nilfisk said its position has always been that section 18.1 does not apply in this case. It's now doing a complete U-turn on what it believes now applies on appeal. But in short, Your Honor, the district court erred when awarding costs for a repair remedy in the form of a topping slab, instead of a replacement remedy for the foundation and a replaced foundation, essentially. Can I ask you about what we'll call the unrebutted cost? Your counsel on the other side said that everyone agrees that there was error. Is that true? We believe that there is error. I think we would probably disagree with the other side on it, and if I can parse it out for Your Honor, if you look at the district court's opinion on how it reached the $5 million plus, $5.6 million, I believe, number, we do not believe that the court explained how it got to that number. It's one paragraph that says the amount is $5.6, $4.9 million, or $5.9 million, or some dang thing, and then said that it's Mr. McMahon's testimony, which I find reliable and sufficiently detailed, and that there are unrebutted costs and I'm going to award them. And it's like, I don't know, I was looking at it trying to do the math, and I was having a hard time getting to the numbers. Now, it seems to me that whatever factual findings that is, we have a right to expect the district court will tell us more about $5.5 million than we saw in a report somewhere, and it seems good to me. Next. Your Honor, we had trouble making the math work, too, to be frank with you. But what we don't think the court got wrong is that there were unrebutted costs. We believe that the court found that the proof that Fort Worth Partners put forth was stronger, weighed more than what the other side had put forth. And so we don't think that the court got that issue wrong, but we do think that it undervalued, in our opinion, by about $2 million, the unrebutted cost of damages to Fort Worth Partners. Your Honors, I see that my time has expired. If the court has no other questions, I will take my seat. Thank you, Your Honors. One minute. Thank you very much, Your Honor. I will just address the cross-appeal arguments very briefly, because I did not yet have an opportunity on those. So even accepting the Fort Worth Partners' construction of the contract, as to whether they were entitled to the cost of the foundation, and whether that's a full replacement cost, even if you assume they are correct on all of those arguments, there is, as the district court put it, a giant black box as to what the damages for the foundation would have been. The district court tried to come up with a calculation of damages for the foundation. It had asked the experts questions during their testimony. It reviewed their reports carefully. And the Fort Worth Partners' experts said, we don't know, because Fort Worth Partners did not do the testing it needed to even determine the extent of damage to the foundation, or what kind of foundation it was. The district court noted that the experts said, from a visual inspection, it appeared to be a concrete foundation. No one knew. The district court was left grasping at straws to come up with a number for damages for the foundation. It subsequently determined under the contract it wasn't entitled to those. But even if you accept Fort Worth Partners' arguments about how the lease should be construed, they did not put on the evidence they needed to at trial to get any more damages for the foundation than what the district court awarded. And on the last point about the unrebutted costs, I appreciate my colleague's frank discussion of that, because I think the parties do need to go back to figure out exactly what went into that component. And it's a big component. Five and a half million dollars for unrebutted costs was the second largest portion of the damages award for the building and for the case as a whole. Thank you very much for allowing me to speak. Now, what's supposed to happen about that, in your view? Your Honor, if you vacate We're supposed to send it back? Yes, if you vacate just that portion of the damages award, I think just You want us to vacate that? Yes, that's correct. And remand to the district court. And I think at that point the district court could, you know, invite the parties to further brief or, you know, review its own record materials to try and come up with that or award any other such relief it thought was appropriate on that. Thank you very much. Thank you, counsel. The case has been thoroughly briefed and argued, and we'll take it under advisement.